Filed 6/9/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ETELVINA JIMENEZ ET AL. et al., | C071959 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201100096852-CUPOGDS) |
| v. | |
| 24 HOUR FITNESS USA, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge. Reversed.

Moseley Collins III and Thomas G. Minder for Plaintiffs and Appellants.

Bruce L. Davis and Jack C. Nick for Defendant and Respondent.

Plaintiffs Etelvina and Pedro Jimenez appeal from summary judgment in favor of defendant 24 Hour Fitness USA, Inc. ("24 Hour") in plaintiffs' negligence action stemming from a catastrophic injury sustained by Etelvina while using a treadmill at 24 Hour. Plaintiffs asserted that 24 Hour was grossly negligent in setting up the treadmill in a manner that violated the manufacturer's safety instructions. 24 Hour moved for summary judgment, contending that it was not liable as a matter of law because Etelvina

1

signed a liability release when she joined the gym. The trial court agreed and granted summary judgment.

On appeal, plaintiff contends that the trial court erred in granting summary judgment in 24 Hour's favor because: (1) the liability release is not enforceable against plaintiffs' claim of gross negligence; (2) the release was obtained by fraud and misrepresentation; and (3) the release only encompasses reasonably foreseeable risks and Etelvina's injury was not reasonably foreseeable at the time she signed the release.

The third contention is forfeited for purposes of this appeal, but we agree with the first two contentions. Accordingly, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### Undisputed Facts[1]

Plaintiffs filed a complaint against 24 Hour stating causes of action for premises liability, general negligence, and loss of consortium. The action arose out of injuries Etelvina sustained on January 16, 2011, while exercising at a 24 Hour facility in Sacramento, California. Etelvina's expert opined that she fell backwards off of a moving treadmill and sustained severe head injuries when she hit her head on the exposed steel

---

[1] The facts are taken from plaintiffs' and 24 Hour's separate statements of fact. The only fact that was specifically disputed was 24 Hour's claim that plaintiffs did not identify "any statutory violation committed by 24 Hour." Plaintiffs disputed this assertion, responding that Civil Code section 1668 precludes releases obtained through fraud. 24 Hour did not dispute any of plaintiffs' facts but did object to most of them on various evidentiary grounds, and the trial court overruled these objections. The court's ruling on defendant's objections is not challenged on appeal. Accordingly, plaintiffs' separate statement of facts is undisputed for purposes of our review on appeal. (See *Guz v. Bechtel Nat., Inc.* (2000) 24 Cal.4th 317, 334 ["On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained."].)

2

foot of a leg exercise machine that 24 Hour placed approximately three feet ten inches behind the treadmill.

24 Hour filed an answer to the complaint generally denying the allegations and claiming several affirmative defenses, including the defense that plaintiffs' claims were barred by a liability release.

At the time of her injuries, Etelvina was a member of 24 Hour. She joined 24 Hour approximately two years before the day she sustained her injury, and thereafter, she used the facilities regularly several times per week. On the day she joined, she was directed to the Membership Manager, Justin Wilbourn. She was then required to sign a membership agreement. However, Etelvina could not read or speak English, and Wilbourn did not speak Spanish. Wilbourn knew Etelvina did not read or speak English. Nevertheless, he did not call a Spanish-speaking employee to help him translate. Instead, he pointed to his computer screen to a figure, $24.99, indicating the membership fee, and made pumping motions with his arms like he was exercising. Etelvina understood the numbers, which are identical in Spanish, and she understood Wilbourn's physical gestures to mean that if she paid that amount, she could use the facility. She could not read anything else. Wilbourn then pointed to the lines in the agreement for Etelvina to sign.

The membership agreement contained a liability release provision, which provided: "Using the 24 Hour USA, Inc. (24 Hour) facilities involves the risk of injury to you or your guest, whether you or someone else causes it. Specific risks vary from one activity to another and the risks range from minor injuries to major injuries, such as catastrophic injuries including death. **In consideration of your participation in the activities offered by 24 Hour, <u>you understand and voluntarily accept this risk and agree that 24 Hour</u>, its officers, directors, employees, volunteers, agents and independent contractors <u>will not be liable for any injury</u>, including, without limitation, personal, bodily, or mental injury, economic loss or any damage to you,**

3

**your spouse, guests, unborn child, or relatives resulting from the negligence of 24 Hour or anyone on 24 Hour's behalf or anyone using the facilities <u>whether related to exercise or not</u>**. . . . By signing below, you acknowledge and agree that you have read the foregoing and know of the nature of the activities at 24 Hour and you agree to all the terms on <u>pages 1 through 4</u> of this agreement and acknowledge that you have received a copy of it and the membership policies."

Wilbourn did not point out the release to Etelvina or make any other indications about the scope of the agreement aside from his gestures mimicking exercise and the fee. Etelvina believed she signed an agreement only to pay the monthly fee of $24.99. In her declaration supporting plaintiffs' separate statement, Etelvina declared that "Wilbourn misrepresented the agreement and deceived [her]. He hid from [her] that she was also signing a release of liability." Etelvina also declared that Wilbourn "misled" and "defrauded" her, and she relied on Wilbourn's "indication of the meaning of the contract."[2]

Etelvina has no memory of the incident leading to her injuries. However, Laurence H. Neuman, an expert on civil engineering and accident reconstruction, investigated the incident. In the course of his investigation, Neuman determined that the 24 Hour location in question had 21 treadmill machines. In the area where Etelvina fell, "the distance directly behind the running belt of the treadmill to the closest piece of equipment was 3 feet 10 inches." Neuman determined that other treadmills in the gym were placed with an even shorter distance between the running belts and other gym equipment, approximately three feet. These measurements reflect the same conditions present at the time of Etelvina's injuries.

---

[2] Plaintiffs also submitted a declaration by Etelvina's sister, Emelia Villaseñor, who declared that she went through the same process at 24 Hour and was similarly misled as to the contents of the membership agreement.

However, the treadmill manufacturer's owner's manual instructed in a section titled "Treadmill Safety Features": "[I]t is important to keep the area around the treadmill open and free from encumbrances such as other equipment. The minimum space requirement needed for *user safety* and proper maintenance is three feet wide by six feet deep . . . directly behind the running belt." (Italics added.) The manufacturer's assembly guide for the treadmill also says to provide a minimum six-foot clearance behind the treadmill for "user safety" and maintenance. Neuman determined that none of the 21 treadmills at this 24 Hour location had a six-foot safety clearance. Neuman concluded that 24 Hour's act of placing other exercise equipment within the six-foot safety zone increased the risk of injury to persons using the treadmills.

Dr. James P. Dickens assessed Etelvina's injuries, her medical records, and Neuman's findings, and he determined that Etelvina fell backward while using the treadmill and "struck her head, fracturing the right occipital bone and right temporal bone." Dr. Dickens noted that while the gym floor is covered with shock-absorbing material, there was a leg exercise machine with an exposed steel foot that was approximately three feet ten inches behind the treadmill's moving belt. Dr. Dickens opined that it was unlikely that Etelvina would have suffered the skull fractures had her head landed on the shock-absorbing floor coverings behind the treadmill and she likely hit her head on the leg machine. Additionally, Barton Waldon, a certified personal fitness trainer, opined that it is foreseeable that treadmill-users occasionally trip, stumble, or fall off treadmills. Waldon declared that "[f]or the safety of the users and in order to minimize injury, it is important that a safety zone behind the treadmill be kept clear of other machines and obstacles so that users falling off or pushed off the rear of the treadmill do not strike such objects." Accordingly, Waldon opined that 24 Hour's act of placing exercise equipment inside the safety zone "greatly increased the risk of injury to [Etelvina]."

In his deposition, Wilbourn, the Membership Manager for 24 Hour, said that he did not remember meeting Etelvina, although he identified himself as the employee who assisted her based on his signature on her membership agreement. Wilbourn testified that typically, when he encountered a potential customer who only spoke Spanish, his habit and custom was to have a Spanish-speaking employee handle the sign-up for that potential customer.

## Motion for Summary Judgment

24 Hour filed a motion for summary judgment, or in the alternative, summary adjudication, asserting that plaintiffs' claims were barred by the release. As for the loss of consortium cause of action, 24 Hour argued the claim was barred because it was derivative of plaintiffs' negligence and premises liability causes of action. Plaintiffs opposed the motion, contending that the release was invalid because 24 Hour was grossly negligent and because 24 Hour obtained the release through fraud. However, plaintiffs did not specifically raise the argument that the release did not encompass Etelvina's injury because it was not reasonably foreseeable to her at the time she signed the release that 24 Hour would intentionally increase her risk of injury.

Plaintiffs argued that due to 24 Hour's fraud in obtaining Etelvina's signature on the release, the release was ineffective. Plaintiffs further argued that the holding in *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163 (*Randas*), does not apply here, because in this case, unlike in *Randas*, there was overreaching and fraud. The court inquired how Etelvina could know that Wilbourn misrepresented the nature of the release if she could not understand English. Plaintiffs' counsel replied that Wilbourn communicated with her about the purported contents of the membership agreement through gesturing and pointing at the numbers on the computer screen. The court then inquired about the gross negligence exception to enforcing releases, pointing out that plaintiffs did not specifically allege a cause of action for gross negligence in their complaint. Plaintiffs responded that under California law, there is not a distinct cause of

action for gross negligence and alleging general negligence suffices.[3] Plaintiffs also contended that the question of gross negligence is a question of fact to be resolved by the jury rather than a matter of law to be resolved on summary judgment. The court questioned whether there was an industry standard on the appropriate safety clearance behind treadmills. Plaintiffs contended that the industry standard is evidenced in the manufacturer's directions and Waldon's declaration. The court expressed concern that Waldon's "assumption is predicated upon the fact that she was on the treadmill. If you assume she was not on the treadmill, and we don't have any tissue or hair or blood on a piece of equipment that would allow us to pinpoint where it is, we can't really know what was happening at the time of the accident." The court indicated that while that circumstance did not necessarily mean defendant should prevail, it was something for the court to consider. Plaintiffs' counsel responded that the court identified a factual dispute in the case for a jury to decide.

During oral argument in the trial court, 24 Hour focused on the question of whether there was evidence of gross negligence, claiming it was impossible to detect the cause of plaintiffs' injuries because she could not remember what happened. The trial court observed that this might be "a question of proof at trial." The court then asked defense counsel why Etelvina's testimony that Wilbourn misrepresented the content of the release would not create a factual issue for trial. Defense counsel responded that

---

[3] 24 Hour does not make a contrary argument on appeal. We agree with plaintiffs that California does not recognize a distinct common law cause of action for gross negligence apart from negligence. (*Continental Insurance Co. v. American Protection Industries* (1987) 197 Cal.App.3d 322, 329-330; *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 779-780 (*Santa Barbara*).) As a degree of negligence, "[g]ross negligence is pleaded by alleging the traditional elements of negligence: duty, breach, causation, and damages." (*Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, 1082 (*Rosencrans*).)

7

there was no evidence of "an affirmative act to deceive." The court took the matter under submission.

The trial court granted 24 Hour's motion. In its ruling, the court wrote that plaintiffs failed to present any evidence that Wilbourn "made any *affirmative* representations that led [Etelvina] to believe she was signing something *other than what the agreement, on its face, purported to be*." The court further wrote that "[t]he fact that [Etelvina] elected to sign the agreement without understanding all of its terms cannot be considered the fault of [24 Hour]." With respect to the gross negligence argument, the court was persuaded by 24 Hour's argument that, as a matter of law, a space of three to four feet as opposed to the recommended six-foot safety zone cannot constitute gross negligence, because "it does not reflect an 'extreme departure from the ordinary standard of conduct.' " The court reasoned that 24 Hour's "placement of the treadmill constitutes at most, ordinary negligence." Consequently, the court ruled that plaintiffs "failed to demonstrate a triable issue of material fact with regard to the enforceability of the release."

## DISCUSSION

### I. Standards of Review

"A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 (*Merrill*), citing Code Civ. Proc., § 437c, subd. (c).) "[G]enerally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fn. omitted (*Aguilar*).) If a defendant shows that one or more elements of a cause of action cannot be established or that there is a complete defense to that cause of action, the burden shifts to the plaintiff to show that a triable issue exists as to one or more material facts. (*Doe v. California Lutheran High*

8

*School Assn.* (2009) 170 Cal.App.4th 828, 834, citing *Aguilar*, *supra*, 25 Cal.4th at p. 849.)  If the trial court finds that no triable issue of fact exists, it then has the duty to determine the issue of law.  (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22.)

On appeal, we review the trial court's decision de novo.  (*Merrill*, *supra*, 26 Cal.4th at p. 476.)  We independently review the papers supporting and opposing the motion, considering all the evidence offered in connection with the motion and any inferences that the evidence reasonably supports, applying the same rules and standards as the trial court.  (*Ibid.*)  We view the evidence in the light most favorable to plaintiffs as the losing party.  (*Saelzler v. Advanced Group* 400 (2001) 25 Cal.4th 763, 768-769.)  In liberally construing the evidence in favor of the party opposing the motion, we resolve all doubts concerning the evidence in favor of the opponent.  (*Miller v. Dept. of Corrections* (2005) 36 Cal.4th 446, 460.)

## II.  Gross Negligence

## A.  The Parties' Contentions

24 Hour contends it met its burden of showing that plaintiffs could not establish the duty element of their negligence cause of action by producing a valid release and the burden thus shifted to plaintiffs to show a triable issue of material fact.  (Cf. *Aguilar*, *supra*, 25 Cal.4th at p. 849.)  24 Hour contends that plaintiffs failed to meet this burden and, accordingly, summary judgment was appropriate.  Conversely, plaintiffs contend that there are triable issues of fact regarding the question of whether 24 Hour's conduct constituted gross negligence, which would preclude 24 Hour's reliance on the release to absolve it from liability.  24 Hour responds that the question of gross negligence was properly decided as a matter of law because plaintiffs' allegation of gross negligence was unsupported in their summary judgment pleadings.  Viewing the evidence in a light most favorable to plaintiffs, liberally construing that evidence and resolving all doubts in their favor, we disagree with 24 Hour.

## B. Analysis

"While often referred to as a defense, a release of future liability is more appropriately characterized as an express assumption of the risk that negates the defendant's duty of care, an element of the plaintiff's case. . . . ' "*The result is that the defendant is relieved of legal duty to the plaintiff; and being under no duty, he cannot be charged with negligence.*" [Citation.]' " (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 719 (*Eriksson II*).) In a summary judgment motion, the defendant bears the burden of establishing the validity of a release "as applied to the case at hand." (*Santa Barbara*, *supra*, 41 Cal.4th at p. 780, fn. 58; see also *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 856 (*Eriksson I*).)

A release cannot absolve a party from liability for gross negligence. (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 750-751, 776-777.) In *Santa Barbara*, our high court reasoned that "the distinction between 'ordinary and gross negligence' reflects 'a rule of policy' that harsher legal consequences should flow when negligence is aggravated instead of merely ordinary." (*Id.* at p. 776, citing *Donnelly v. Southern Pacific Co.* (1941) 18 Cal.2d 863, 871.) A liability release, "to the extent it purports to release liability for future gross negligence, violates public policy and is unenforceable." (*Santa Barbara*, at p. 751.)

The issue we must determine here is whether, with all facts and inferences construed in plaintiffs' favor, the conduct shown by plaintiffs' evidence *could be* found to constitute gross negligence. If so, then it is a question of fact for the jury to determine whether the release in this case was unenforceable for that reason. As our high court has noted, whether conduct constitutes gross negligence is generally a question of fact, depending on the nature of the act and the surrounding circumstances shown by the evidence. (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 767, 781 [reasoning that whether the evidence showed lack of care sufficient to constitute gross negligence was a triable issue of fact in that case].) The Courts of Appeal have followed suit, holding that generally, it

10

is a triable issue of fact whether a defendant's lack of care constitutes gross negligence. (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 358 (*Decker*).)  And when reviewing summary judgment based on the absence of a triable issue of fact as to gross negligence, we must resolve every reasonable doubt in favor of the plaintiffs. (*Rosencrans*, *supra*, 192 Cal.App.4th at p. 1088.)

" 'Ordinary negligence'—an unintentional tort—consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm.  [Citation.]  [¶]  'Gross negligence' long has been defined in California and other jurisdictions as either a ' " 'want of even scant care' " ' or ' " 'an extreme departure from the ordinary standard of conduct.' " ' " (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 753-754; see also *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185-1186 (*Eastburn*).)

In *Santa Barbara*, a developmentally-disabled child attended a special summer camp for disabled children run by the city.  (*Santa Barbara*, *supra*, 41 Cal.4th at pp. 750-753.)  Because she had frequent seizures, the child was assigned a counselor to monitor her closely.  (*Id.* at p. 752.)  However, when her counselor momentarily turned her attention away from the child who was at that time swimming toward the side of the pool, the child suffered a seizure and drowned.  (*Id.* at p. 753.)  The city contended that a release signed by the child's mother had absolved the city of liability for any negligence. (*Id.* at pp. 750, 753.)  On appeal, our high court held that the family's gross negligence claim was not barred by the release because an agreement purporting to protect the releasee from liability for conduct rising to the level of gross negligence is against public policy.  (*Id.* at pp. 770-777.)

In *Rosencrans*, where the court concluded there was a question of fact regarding gross negligence, the showing was similar to the showing in the instant case.  In that case,

11

a motorcyclist was injured during motocross practice.[4] (*Rosencrans*, at pp. 1077, 1083.) The plaintiff presented two pieces of evidence in opposition to the defendant's summary judgment motion, indicating that there was an industry standard to provide caution flaggers on motocross tracks: (1) the " 'Brett Downey Safety Foundation Instructional Manual for Caution Flaggers,' " which provided that caution flaggers should be at their stations at all times while motorcyclists are on the course (*id.* at p. 1086); and (2) a motocross safety expert's declaration that "the common practice for motocross tracks is to have caution flaggers at their assigned posts at all times" (*ibid.*). The court held that because "it is standard practice in the industry to have caution flaggers on their platforms at all times," the defendant's failure to provide a caution flagger raised a triable issue of material fact on the question of gross negligence. (*Id.* at pp. 1081, 1086-1087.)

24 Hour contends that there was no industry standard regarding a treadmill safety zone. They offer no cases or examples of any industry standard that violates a manufacturer's safety directions. Indeed, it could be reasonably inferred that it is unlikely an industry would develop a standard that violates the express safety directions of the manufacturer. Plaintiffs, on the other hand, presented three pieces of evidence indicating a possible industry standard on treadmill safety zones: (1) the treadmill manufacturer's owner's manual instructed in its "Treadmill Safety Features" section that "[t]he *minimum space* requirement *needed for user safety* and proper maintenance is three feet wide by six feet deep" (italics added); (2) the manufacturer's assembly guide for the treadmill also instructs that the treadmill requires a minimum six-foot-deep clearance behind it "*for user safety* and proper maintenance" (italics added); and (3) plaintiffs' expert, Waldon, declared that "[f]or the safety of the users and in order to minimize

---

[4] "Motocross is a sport in which people ride motorcycles and perform jumps off of ramps, while in a setting filled with dust and other people on motorcycles." (*Rosencrans*, *supra*, 192 Cal.App.4th at p. 1083.)

injury, it is important that a safety zone behind the treadmill be kept clear of other machines and obstacles so that users falling off or pushed off the rear of the treadmill do not strike such objects," and he opined that 24 Hour's act of placing other exercise equipment inside the safety zone "greatly increased the risk of injury to [Etelvina]." This evidence is similar to the evidence presented in *Rosencrans.* While Waldon did not expressly use the words "common practice" or "industry standard," such is an inference that his declaration reasonably supports, particularly when viewed in tandem with the manufacturer's safety directions.

In our view, based on the evidence plaintiffs presented, a jury could reasonably find that: (1) it is standard practice in the industry to provide a minimum six-foot safety zone behind treadmills, based on the owner's manual, assembly guide, and Waldon's declaration as an expert; (2) 24 Hour did not provide this minimum six-foot safety zone, as declared by Neuman; and (3) the failure to provide *the minimum* safety zone was an extreme departure from the ordinary standard of conduct, as implied in Waldon's declaration. Accordingly, plaintiffs created a triable issue of fact as to whether the failure to provide the minimum six-foot safety zone constituted an extreme departure from the ordinary standard of conduct.

While the issue of whether there has been gross negligence is generally a triable issue of fact, we recognize that such is not always the case. (See *Decker*, *supra*, 209 Cal.App.3d at p. 358.) For example, in a recent case involving 24 Hour, the court of appeal affirmed summary judgment grounded in part on the trial court's determination that there was no triable issue of fact as to gross negligence. (*Grebing v. 24 Hour Fitness USA, Inc.* (2015) 234 Cal.App.4th 631, 639 (*Grebing*).) The contrast to our case supports our conclusion that, looking at the evidence in a light most favorable to plaintiff, there is a triable issue of fact as to gross negligence in this case.

In *Grebing*, the plaintiff, who had twice signed 24 Hour's release, was injured using a low row machine, when a clip failed causing a handlebar to break free from the

cable and strike him in the forehead. (*Grebing*, *supra*, 234 Cal.App.4th at p. 634.) The evidence disclosed that the clip was the wrong clip, broken, or not working for the machine on which plaintiff was exercising. (*Id*. at p. 635.) Some machines in the facility were missing clips and apparently, members moved clips to other machines. Fifteen minutes before the plaintiff's injury, another member reported that a different machine had a crooked clip. (*Ibid*.) The court held that to the extent the plaintiff was claiming 24 Hour should have inspected and replaced broken or improper clips on all machines within the 15 minutes after the other member's complaint, that claim was insufficient to raise a triable issue of gross negligence. (*Id*. at p. 639.) Further, the court noted that "it is undisputed that 24 Hour took several measures to ensure that its exercise equipment and facility were well maintained. For example, it hired a facilities technician whose job was to conduct a daily inspection of the facility and perform preventative maintenance. If the facilities technician was unavailable, 24 Hour had a practice of requiring other staff members to conduct the inspection and perform any required maintenance." (*Ibid*.) The *Grebing* court concluded, "In view of these measures, 24 Hour's conduct cannot reasonably be regarded as demonstrating a want of even scant care or an extreme departure from the ordinary standard of conduct." (*Ibid*.)

Here, unlike in *Grebing* where there was no notice, 24 Hour knew it was violating the manufacturer's express safety directions when it deliberately arranged the gym equipment without providing a six-foot safety zone for the treadmills. It can be inferred that 24 Hour did so for the purpose of placing more machines into its facility to accommodate more members to make more money. And unlike in *Grebing*, where 24 Hour acted reasonably by conducting daily equipment inspections, there were no mitigation measures that would have prevented the injury plaintiff alleges occurred here. We are not persuaded by 24 Hour's argument that because it provided shock-absorbing flooring materials, it exhibited "some care" and a jury would be precluded from finding gross negligence. A shock-absorbing floor makes little difference when it is covered with

14

gym equipment upon which members could fall and severely injure themselves.  Thus, we cannot agree that this purported mitigation measure precludes a jury finding of gross negligence.

In reaching our conclusion, we also reject 24 Hour's argument, as adopted by the trial court, that "the provision of three to four feet of space as opposed to the recommended six feet cannot, as a matter of law, constitute gross negligence as it does not reflect 'an extreme departure from the ordinary standard of conduct.' "  The misdirected focus on the two to three foot difference between 24 Hour's spacing and the recommended *minimum* spacing impliedly suggests that such difference was negligible and not "an extreme departure."  However, when one thinks of the minimum safety zone recommended by the treadmill manufacturer in terms of the height of adult human beings and the high likelihood of a person falling off a treadmill impacting nearby equipment as close as three feet, it seems clear that the reduced zone established by 24 Hour here can hardly be considered a "safety" zone at all.  Accordingly, it strikes us that a departure of two to three feet from the recommended minimum six-foot safety zone makes a great difference under these circumstances.  Without any expert testimony indicating otherwise and in light of plaintiffs' expert's declaration corroborating the manufacturer's directions and the financial motivation that can be inferred from the evidence, we cannot agree that as a matter of law, the spacing of the machines demonstrates at least scant care and is not an extreme departure from the ordinary standard of conduct.

24 Hour contends that if the facts in several cases it cites do not amount to gross negligence, then the facts in this case certainly do not.  In our view, 24 Hour's cited cases are distinguishable.

24 Hour cites *Decker* as a comparable case on gross negligence.  In *Decker*, a surfer became entangled in the tether of a submerged lobster trap and drowned after the city pursued an antiquated surf rescue method, the "lifeline rescue method."  (*Decker*, *supra*, 209 Cal.App.3d at pp. 352-353, 360.)  There was evidence that the rescue

personnel arrived promptly and made diligent efforts to attempt to rescue the surfer both with the sheriff's dive team and with a helicopter, but the dive team used a rescue method disfavored for surf rescues. (*Id.* at pp. 360-361, 363.) The court reasoned that this evidence "could support a finding that use of the lifeline rescue method is a disfavored surf rescue method and would not be used by an experienced, trained surf rescuer but it does not support a finding the sheriff's dive team was grossly negligent for having used this method *given their lack of training or experience in surf rescue*." (*Id.* at p. 360, italics added.) The *Decker* court also noted that plaintiffs did not contest the validity of the sheriff's first rescue attempt with the helicopter, which also failed. (*Id.* at pp. 360-361.) The failure to train for and use a specialized rescue method during an otherwise diligent rescue effort that included another undisputed rescue method is very different from 24 Hour's failure to follow the treadmill manufacturer's explicit directions to maintain a minimum six-foot safety zone. The conduct in *Decker* was, at best, passive negligence by people who did not know any better and did not create or even increase the risk of injury whereas in our case, defendant's conduct actively created or increased the risk of injury to treadmill users by deliberately setting up the equipment in a dangerous manner.

In *DeVito v. State of California* (1988) 202 Cal.App.3d 264 (*DeVito*), another case upon which 24 Hour relies, a hiker swung from a fire hose hung over a tree limb in a mountain canyon on public land, lost her grip, and fell down a steep slope, sustaining injuries. The appellate court affirmed dismissal of her complaint against the state on demurrer, primarily focusing on a statute, Government Code section 831.7, which provides "a public entity is not liable to 'any person who participates in a hazardous recreational activity . . . for any . . . injury . . . arising out of that . . . activity.' " (*Id.* at pp. 267, 270.) The court noted that under the statute, " 'tree rope swinging' " is listed as one such hazardous recreational activity, and the primary issue on appeal was one of interpreting this statute. (*Ibid.*) The court, in a single, short paragraph, only briefly

16

discussed the plaintiff's secondary argument that the state engaged in gross negligence, concluding in summary fashion that *no* facts alleged in the complaint supported the allegation of gross negligence.  (*Id.* at p. 272.)

*DeVito* is distinguishable on several bases.  First, in this case, plaintiffs here did allege facts in their summary judgment opposition which support a finding of gross negligence, as discussed *ante*.  Second, as in *Decker*, the plaintiff in *DeVito* did not allege facts indicating that the defendant actively created or increased the risk of harm.  Instead, plaintiff alleged that the state failed to " 'guard or warn of [a] known dangerous condition,' " which would not ordinarily rise to the level of gross negligence.  (*DeVito*, *supra*, 202 Cal.App.3d at pp. 267, 272.)  Third, and significantly, the court's opinion in *DeVito* focused on the plaintiff's failure "to guard or warn" argument because the gross negligence argument was barely raised and not supported in the plaintiff's argument on appeal.  (*Id.* at p. 272.)  The court noted, "We could, but choose not to, ignore this contention since it is set forth in a single sentence of appellant's opening brief, unsupported by either argument or authority."  (*Id.* at p. 272, fn. 7.)  Accordingly, *DeVito* provides little analysis of the gross negligence exception to liability releases and equally little support to 24 Hour's position.

A third case cited by 24 Hour is even less helpful.  *Eastburn*, *supra*, 31 Cal.4th 1175, involved a claim of gross negligence based on a 911 operator putting the plaintiff on hold.  An injured child and her parents sued, contending that the child suffered injuries because of the failure to provide prompt emergency response to the 911 call.  (*Id*. at p. 1179.)  Our high court affirmed the trial court's finding that plaintiffs would be unable to allege gross negligence to amend their defective complaint.  (*Id*. at pp. 1179, 1185-1186)  On this point, the court wrote:  "Plaintiffs' briefs before the Court of Appeal made the additional allegation that the 911 dispatcher put them 'on hold' during their telephone conversation, but such conduct would hardly amount to gross negligence or bad faith. The case law has defined gross negligence as ' "the want of even scant care or an extreme

departure from the ordinary standard of conduct." ' [Citations.] Nothing in plaintiffs' pleadings or appellate briefs points to such extreme conduct. Accordingly, the trial court properly sustained the demurrer without leave to amend." (*Id*. at pp. 1185-1186.) *Eastburn* provides no factual analogue suitable for comparison to our case.

At oral argument, in addition to *Grebing*, *supra*, 234 Cal.App.4th 631, 24 Hour cited two other recent cases, which we also find distinguishable. In *Honeycutt v. Meridian Sports Club, LLC* (2014) 231 Cal.App.4th 251, the plaintiff sued a sports club for a knee injury she sustained while attempting a kicking maneuver in a kickboxing class taught by a personal trainer. (*Id*. at pp. 254-255.) The trainer attempted to correct the plaintiff's form by holding her kicking leg while he instructed her how to pivot her planted leg. (*Ibid.*) To support her claim that the defendant was grossly negligent, the plaintiff presented an expert declaration asserting that "an instructor should not touch the student, and instead should demonstrate and verbalize the maneuver and regress to an easier maneuver if the kick was too difficult for the student's skills." (*Id.* at p. 259.) On appeal from summary judgment in the defendant's favor, the Court of Appeal reasoned that there was no triable issue of fact as to gross negligence because "[a] mere difference of opinion as to how a student should be instructed does not constitute evidence of gross negligence." (*Id.* at p. 260.) This strikes us as a quintessential case of, at most, ordinary negligence. Unlike our case, there was no evidence that the defendant violated something like an industry standard, or manufacturer's safety directions or otherwise made an extreme departure from the ordinary standard of conduct.

Defendant also cited *Eriksson II*, *supra*, 233 Cal.App.4th 708 at oral argument and ignored *Eriksson I*. In *Eriksson*, the plaintiffs' daughter was killed in an equestrian mishap. The Court of Appeal in *Eriksson I* reviewed the trial court's ruling granting summary judgment. Looking at the evidence in a light most favorable to the plaintiffs, the court concluded that the plaintiffs produced evidence sufficient to support a jury finding that a riding coach was grossly negligent in persuading the mother to allow her

18

daughter to compete in an equestrian competition on a recently injured and unfit horse. (*Eriksson I*, *supra*, 191 Cal.App.4th at p. 857.) Following a remand for trial, the trial court entered judgment after the plaintiffs' case-in-chief. The trial court found, based on the trial evidence, that the defendant's conduct did not rise to the level of gross negligence. (*Eriksson II*, at p. 718.) On review, the Court of Appeal reasoned that because the defendant "established the validity of the release in the sense that it was binding and enforceable against [the plaintiffs]," the plaintiffs then had the burden of establishing that the defendant was grossly negligent in their case-in-chief at trial. (*Id.* at pp. 733-734.) Based on this procedural posture, the *Eriksson II* court applied a deferential standard of review (as opposed to the de novo review of the summary judgment in *Eriksson I*). The court "review[ed] the record to determine whether the evidence establishe[d], *as a matter of law*" that the defendant was grossly negligent. (*Id.* at p. 734, italics added.) The court determined that the plaintiffs failed to meet this burden at trial; however, it did not publish the portion of the opinion analyzing *why* the trial evidence failed to establish that the defendant was grossly negligent as a matter of law. (*Ibid.*) Accordingly, the case is of little utility to 24 Hour. In any event, due to the vastly different procedural posture and deferential standard of review, *Eriksson II* is distinguishable from our case. Indeed, the court in *Eriksson I*, citing *Santa Barbara*, noted that in the context of a summary judgment motion, the defendant bears the burden of establishing the validity of a release "as applied to the case at hand." (*Eriksson I*, at p. 856, italics omitted, citing *Santa Barbara*, *supra*, 41 Cal.4th at p. 780, fn. 58.) And as we have noted, our high court held that a release from liability for gross negligence is invalid and unenforceable. (*Santa Barbara*, at pp. 750-751.) Thus, the opinion in *Eriksson I* is far more instructive where the Court of Appeal reversed the summary judgment in the defendant's favor, reasoning that the plaintiffs showed there were material issues of fact as to whether the defendant was grossly negligent. (*Eriksson I*, at p. 857.)

In the trial court, 24 Hour did not explicitly dispute plaintiffs' separate statement of facts in its moving papers; instead it opted to object to most of plaintiffs' facts instead. On appeal, 24 Hour repeatedly disputed plaintiffs' factual allegations in its brief. Specifically, defendant makes much of the fact that Etelvina cannot remember her fall, contending there is *no* "evidence that she actually fell backwards off of a moving treadmill." However, this argument ignores plaintiffs' expert declarations opining what likely happened to Etelvina based on her injuries, the location of her fall, and accident reconstruction. Although 24 Hour's factual presentation in its briefing does not view the facts in the light most favorable to plaintiffs, we must do so. And while the experts' opinions may or may not be credible at trial, this is an inherently factual issue for a jury to decide.[5]

We emphasize that "we are not passing judgment upon the merits of plaintiffs' allegations; rather, we are viewing the allegations in the light most favorable to plaintiffs, as required by the law." (*Rosencrans*, *supra*, 192 Cal.App.4th at p. 1089.) A jury may very well conclude that Etelvina was not injured in the manner alleged, that there was no industry standard on treadmill safety clearances, and that 24 Hour's conduct did not rise to the level of gross negligence, but we are unwilling to reach these conclusions as a matter of law based on the record before us. In a case involving disputes of fact such as how and where Etelvina fell and whether there is an industry standard on treadmill safety zones, summary judgment is a "drastic remedy." (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 17.) Accordingly, we

---

[5] 24 Hour notes its objections to plaintiffs' evidence and contends that these expert opinions are inadmissible. However, the trial court overruled 24 Hour's evidentiary objections, and 24 Hour does not challenge this ruling on appeal. Accordingly, this argument is forfeited. (*Salehi v. Surfside III Condominium Owners Assn.* (2011) 200 Cal.App.4th 1146, 1161-1162.)

conclude that the trial court erred in ruling that plaintiffs did not present a triable issue of fact regarding whether 24 Hour engaged in gross negligence.

### III. Fraud and Misrepresentation

### A. The Parties' Contentions

Plaintiffs contend that there are triable issues of fact as to whether 24 Hour obtained Etelvina's signature on the liability release through fraud and misrepresentation, which would invalidate the release as to all of plaintiffs' theories of recovery. In the trial court, plaintiffs presented the declarations of Etelvina and her sister, another 24 Hour member, testifying that before they signed their respective releases, the 24 Hour employees misrepresented and concealed the contents of the agreements. Specifically, Etelvina declared that Wilbourn gestured and pointed to represent that the agreement was to pay a certain amount of money per month for the gym membership and that she relied on that representation when she signed the release. However, the trial court ruled that plaintiffs presented "no evidence that Mr. Wilbourn made any *affirmative* representations that led [Etelvina] to believe she was signing something *other than what the agreement, on its face, purported to be*."

On appeal, plaintiffs argue that 24 Hour failed to conclusively establish the enforceability of the release because they produced evidence that Wilbourn did not act in good faith and made affirmative misrepresentations to Etelvina through non-verbal gestures and by pointing to the monthly payment amount on his computer screen. Additionally, plaintiffs point out Wilbourn violated his own policy as the Membership Manager of referring Spanish-speaking customers to sign up with Spanish-speaking employees.[6] 24 Hour responds that it owed no duty to translate or explain the agreement

---

[6] Plaintiffs repeatedly refer to this as a 24 Hour policy, but citations to Wilbourn's deposition reveal that the questions directed toward him and his answers related to what *he* did and *his habit and custom*.

to Etelvina, and the material facts alleged by plaintiffs do not raise a triable issue of whether Wilbourn misrepresented the contents of the agreement.

## B. Analysis

"A release may negate the duty element of a negligence action." (*Benedek v. PLC Santa Monica* (2002) 104 Cal.App.4th 1351, 1356.) As we have noted, in order to absolve itself of responsibility for any ordinary negligence, it was the 24 Hour's burden to establish the validity of the release "as applied to the case at hand." (*Santa Barbara*, *supra*, 41 Cal.4th at p. 780, fn. 58; see also *Eriksson I*, *supra*, 191 Cal.App.4th at p. 856.)

Generally, a person who signs an instrument may not avoid the impact of its terms on the ground that she failed to read it before signing. (*Randas*, *supra*, 17 Cal.App.4th at p. 163.) However, a release is invalid when it is procured by misrepresentation, overreaching, deception, or fraud. (*Ibid.*) "It has often been held that if the releaser was under a misapprehension, not due to his own neglect, as to the nature and scope of the release, and if this misapprehension was induced by the misconduct of the releasee, then the release, regardless of how comprehensively worded, is binding only to the extent actually intended by the releaser." (*Casey v. Proctor* (1963) 59 Cal.2d 97, 103, fn. omitted.) "In cases providing the opportunity for overreaching, the releasee has a duty to act in good faith and the releaser must have a full understanding of his legal rights. [Citations.] Furthermore, it is the province of the jury to determine whether the circumstances afforded the opportunity for overreaching, whether the releasee engaged in overreaching and whether the releaser was misled. [Citation.]" (*Frusetta v. Hauben* (1990) 217 Cal.App.3d 551, 558 (*Frusetta*).) A "strong showing of misconduct" by plaintiff is not necessary to demonstrate the existence of a triable issue of fact here; only a " 'slight showing' " is required. (*Id*. at pp. 559-560.)

Here, if a jury were to be persuaded that Wilbourn made misrepresentations to Etelvina about the contents of the agreement by making nonverbal gestures indicating that what she was signing related *only* to being allowed to exercise if she paid the price

on the computer screen, it would be entitled to find that Etelvina's signature on the release was produced by misrepresentation and that the release is not enforceable against her.  (See *Seeger v. Odell* (1941) 18 Cal.2d 409, 414 [one who has been induced by fraudulent misrepresentations to sign agreement is entitled to have agreement set aside]; *Blankenheim v. E.F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1474 [same]; see also *American Trust Co. v. California Western States Life Insurance Co.* (1940) 15 Cal.2d 42, 65 ["Regardless of whether one is under a duty to speak or disclose facts, one who does speak must speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading."].)  Thus, we must determine whether, with all facts and inferences construed in plaintiffs' favor, the conduct shown by plaintiffs' evidence could be found to constitute fraud.  If so, then it is a question of fact for the jury to determine whether the release in this case was ineffective.

In *Frusetta*, a personal injury case, the plaintiff asserted that an insurance adjuster who worked for Twentieth Century told her that a preprinted check was to be a partial payment for injuries she suffered in a car accident, and the adjuster represented to her that another payment would be forthcoming.  (*Frusetta*, *supra*, 217 Cal.App.3d at p. 554.)  The check included the words, " 'Bodily injury in full and final settlement.' "  (*Ibid*.)  The reverse of the check stated that if " ' "Full and Final Settlement" is printed on the front of the draft, endorsement of the draft constitutes a full Release of all claims known or unanticipated which the under-signed has or may hereafter have against the Payor . . . .' "  (*Ibid*.)  The plaintiff endorsed and cashed the check, and Twentieth Century claimed that by doing so, she released it from any further liability.  (*Id.* at pp. 554-555.)  The *Frusetta* court reasoned, "it is clearly possible that a jury might find the circumstances demonstrated fraud or overreaching on the part of Twentieth Century. If a jury accepted [the plaintiff's] testimony a Twentieth Century adjuster stated to her the check was a partial settlement and the rest would be paid later, then it might be found Twentieth Century violated its duty to act in good faith."  (*Id.* at p. 558.)  Accordingly,

23

the court held there was a triable issue of fact as to whether "a fraud or misrepresentation . . . induced a party's signing of a release '[where] it substantially contribute[d] to his decision to manifest his assent.' " (*Id.* at pp. 556-557.)

A recent Ninth Circuit case applying California law, *Doe v. Gangland Productions, Inc.* (9th Cir. 2013) 730 F.3d 946 (*Gangland*), is also instructive. There, the plaintiff sued two production companies for broadcasting a television documentary without concealing his identity. (*Id.* at pp. 951-952.) In an anti-SLAPP motion to strike the complaint, among other arguments, the defendants contended that the plaintiff's claims were barred because he signed a release consenting to disclosure of his real identity in the broadcast and waiving all claims for liability. (*Id.* at pp. 957-958.) In order to overcome the anti-SLAPP motion, the plaintiff had to demonstrate a probability of prevailing on the merits of his claims. (*Id.* at p. 957.) In a declaration, the plaintiff stated that he was dyslexic, illiterate, and that he informed the Gangland producer who asked him to sign the release that he had " 'extreme difficulty reading.' " (*Id.* at p. 952.) The plaintiff also stated that "when he was provided the alleged release, [the producer] told him it was 'just a receipt' for his $300 payment for the interview. Because of these representations, [the plaintiff] did not ask his girlfriend to read out loud the document before he signed it." (*Id.* at p. 958.) The court reasoned that the plaintiff "made a sufficient showing of fraud in the execution of the release, which, if true, would render the release void." (*Ibid.*)

In reaching its conclusion, the court in *Gangland* cited *Mairo v. Yellow Cab Co.* (1929) 208 Cal. 350. In *Mairo*, the California Supreme Court reviewed a directed verdict in the defendant's favor, where the trial court concluded that the plaintiff had waived his rights by executing several releases. (*Id.* at pp. 351-352.) The plaintiff was an illiterate Russian immigrant who understood little spoken English. (*Id.* at p. 351.) He was injured after being hit by the defendant's taxicab and during the course of his medical treatment, the defendant had him sign several releases in exchange for the payment of his medical

24

treatment.  (*Id.* at pp. 351-352.)  The plaintiff asserted that the defendant misrepresented the true contents of the releases and that he believed they were merely a permit to operate on him and receipts.  (*Id.* at p. 352.)  The court held that if the true nature of the releases was "misrepresented to [the plaintiff] so that he did not know what he was really signing, they are, of course, void.  But under the conflicting evidence here it is impossible to tell whether such was the fact. This also was an issue which should have gone to the jury and it was, therefore, erroneous for the trial court to direct said verdict for defendant."  (*Ibid.*; see also *Meyer v. Haas* (1899) 126 Cal. 560, 562 [holding that a release was void where the releaser could not read English and understood little spoken English, and the releasee "did not convey full information as to [the release's] contents"].)

Defendant dismisses the application of *Frusetta* and other cases where there was "affirmative misrepresentation or fraud" regarding the nature or character of the document in question, because here there was no verbal misrepresentation.  However, in our view, this is a distinction without a difference.  24 Hour contends that these non-verbal communications cannot, as a matter of law, amount to *affirmative* misrepresentations because Etelvina "could not reasonably have relied upon anything Mr. Wilbourn said" since he spoke a different language.  24 Hour's argument implies that non-verbal communications cannot be misrepresentative or induce reasonable reliance. We reject this argument.  While it may be less reasonable for a plaintiff to rely on non-verbal communications in a case where the parties speak the same language, in this case, gesturing was virtually the *only* form of communication between Wilbourn and Etelvina. It is undisputed that Etelvina did not speak English and Wilbourn did not speak Spanish. Further, Wilbourn knew Etelvina did not speak or read English.  And he knew that Etelvina did not read the contract, including the terms setting forth the release, even though, as the membership manager, he must have known that the release says, "By signing below, you acknowledge and agree that *you have read* the foregoing" provisions of the release.  (Italics added.)  Under these circumstances, already ripe for

25

misrepresentation and overreaching, Wilbourn's gestures and pointing may very well have misrepresented the nature of the document Etelvina signed. This is an inherently factual question for a jury to decide. (See *Jordan v. Guerra* (1943) 23 Cal.2d 469, 475 ["[I]t is for the trier of the facts to determine what the plaintiff understood was covered by the writing and whether his understanding different from the writing was induced by the defendant."].)

24 Hour relies heavily on *Randas*, *supra*, 17 Cal.App.4th 158, arguing that under *Randas*, a case involving a release signed by a person who did not speak English, it had no duty to translate or explain the membership agreement to Etelvina and that Etelvina had no one to blame but herself. *Randas* does not help 24 Hour because there was no claim of fraud or overreaching in that case and the releasee had no reason to think the releaser could not read the release. Indeed, the *Randas* court made a point of those circumstances, specifically noting, "Appellant made no claim of respondent's fraud or overreaching. Nor did appellant claim that respondent had reason to suspect she did not or could not read the release she had signed and which in full captions above and below her signature stated: 'I Have Read This Release.' " (*Id.* at p. 163.) Here, plaintiffs' theory is fraud and overreaching. And it is clear that Wilbourn knew Etelvina could not and did not read the release.

Accordingly, we reverse the trial court's ruling on this basis as well.

## IV. Foreseeability that 24 Hour Would Intentionally Increase the Risk of Danger

On appeal, plaintiffs also contend that the release is unenforceable because a release only encompasses risks that are foreseeable at the time it is signed, and it was not reasonably foreseeable that 24 Hour would intentionally increase the risk of danger to its treadmill users. However, plaintiffs did not pursue this argument below in either their opposition to the summary judgment motion or during oral argument on the motion. Additionally, plaintiffs did not allege that 24 Hour engaged in intentional conduct in their complaint or raise undisputed facts pertaining to this foreseeability theory in their

26

separate statement of facts.  Accordingly, we decline to consider this argument for the first time on appeal.  (See *Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767 [reasoning that generally, theories not raised in the trial court cannot be asserted for the first time on appeal, particularly where it is unclear whether the theory raises a pure question of law].)

## DISPOSITION

The judgment is reversed.  24 Hour shall pay plaintiffs' costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(1) & (5).)


       MURRAY       , J.


We concur:


      BLEASE      , Acting P. J.


      HULL       , J.