[No. D037591. Fourth Dist., Div. One. May 7, 2002.]

RICHARD SAFFRO, Plaintiff and Appellant, v.
ELITE RACING, INC., Defendant and Respondent.

COUNSEL

Higgs, Fletcher & Mack and John Morris for Plaintiff and Appellant.

Royce, Grimm, Vranjes, McCormick & Graham and A. Carl Yaeckel for Defendant and Respondent.

OPINION

**McINTYRE, Acting P. J.**—In this case we conclude that the organizer of a marathon has a duty to produce a reasonably safe event. This duty requires it to take reasonable steps to "minimize the risks without altering the nature of the sport"—which includes providing sufficient water and electrolyte replacement drinks as represented in the informational materials provided to the participants. (See *Knight v. Jewett* (1992) 3 Cal.4th 296, 317 [11 Cal.Rptr.2d 2, 834 P.2d 696].)

Richard Saffro appeals from a summary judgment entered against him on his complaint against Elite Racing, Inc. (Elite) for negligence and negligent

supervision in connection with the 1998 "Suzuki Rock 'N' Roll Marathon" in San Diego. Saffro contends the judgment should be reversed because the trial court erred in (1) ruling his suit was barred by the doctrine of primary assumption of risk; (2) excluding the declarations of three race participants; and (3) denying his motion for reconsideration. We agree with Saffro's first contention and find there are issues of material fact on the questions of breach of duty and causation. Thus, we reverse the judgment. This renders Saffro's second and third contentions moot.

FACTUAL AND PROCEDURAL BACKGROUND

The following facts are derived from the evidence admitted by the trial court. On June 21, 1998, Saffro ran in the marathon organized and conducted by Elite. That same day, after completing the race, Saffro boarded a plane to return home to Chicago. Between 60 and 90 minutes into the flight, Saffro suffered a grand mal seizure, necessitating an emergency landing in St. Louis. He was hospitalized in St. Louis and diagnosed with severe hyponatremia—which occurs as a result of decreased sodium concentration in the blood, as well as pulmonary edema and cerebral edema resulting from the hyponatremia. Saffro's condition was critical; he was kept on a ventilator for four days and hospitalized for a longer period. His injuries caused him to suffer neurological deficit; indeed, Saffro's only memory of running the marathon was a "vague recollection of hearing some music, some bands . . . ." Saffro submitted the declarations of medical experts who opined that his hyponatremia was caused by the inability to consume adequate amounts of water and fluids containing electrolytes (such as Gatorade and Race Day) during the marathon.

Prior to the marathon, Elite sent written materials to the participants stating there would be 23 water and refreshment stations located throughout the course, from the 2-mile mark to the 25.1-mile mark. Elite represented that all stations would include water and 11 stations would also distribute Race Day, an electrolyte fluid. Saffro presented evidence that it is customary in the field and runners expect, on the basis of their entry fee, to be "support[ed] along the course" and provided with water and electrolyte fluids at regular intervals. In addition, he testified that in the other two marathons he had run, it was his practice to stop at every refreshment stand and drink the water and electrolyte fluids provided.

Elite also informed the runners in writing that the race would start at 7:00 a.m. and that it anticipated all runners would reach the starting line in less than five minutes. About 6:15 a.m. on the day of the marathon, Saffro drank 12 to 16 ounces of water and then was directed to his "corral" to await the

scheduled 7:00 a.m. start of the race with other runners of similar ability. One thousand participants were assigned to each corral based on their projected race times, with the fastest runners stationed closest to the starting line. No one without an official marathon number was allowed to enter the corrals. The race did not start until about 7:45 a.m., however. During the delay, the cloud cover burned off and it became increasingly warm, yet the runners could not leave the corrals to get more water or other fluids. Several announcements were made during the delay that the race would begin in "only five or ten more minutes"—which was not the case.

According to Elite's records, Saffro completed the marathon in 4 hours, 17 minutes and 32 seconds. Another runner, Kelley Magill, finished the race in approximately 4 hours and 45 minutes. Magill testified that at the first refreshment station at the 2-mile mark, "there was nothing. There were no volunteers, no cups, no water. Nothing." At the next station, there was only a big trash can filled with water—no cups and no volunteers. Magill was hoping to get some water there, but "there were so many people crowded around [the trash can], pushing and yelling" that she kept on running. At the third refreshment station at the 4.1-mile mark—the first station at which Race Day was supposed to be available, there was a volunteer with a jug of water and some cups, but they had run out of Race Day. Water was set out in cups on tables at the 20 remaining stations, but there was no Race Day. Magill looked for and asked for Race Day at every refreshment station along the course, but was told each time that they had "run out of it." She kept running in the race because she thought "there had to be some at the next [station]."

In a postrace letter to the participants regarding the marathon, Elite stated:

"[W]e know that in order to take our place as one of the world's great marathons the 'race fundamentals'—as well as the bells and whistles, must be superb.

"Despite our efforts, we know that too many aspects of the event were not perfect, and we take full responsibility for any and all of those imperfections. We promise to correct them all next year. The race will start on time . . . and you'll be able to drown at our water stations."

Saffro filed his original complaint against Elite for negligence and negligent supervision on June 16, 1999, and on April 3, 2000, he filed an amended complaint stating the same causes of action. Elite filed a motion for summary judgment on May 11, 2000, on the ground that Saffro's causes of action were barred by the doctrine of primary assumption of risk. The trial

court granted the motion, ruling that hyponatremia is an inherent risk of running a marathon and thus, Saffro's claims were barred by the primary assumption of risk doctrine. The court also concluded "there is no evidence that plaintiff attempted to obtain the sport drinks or water during the race at any of the water and refreshment stations or that he was prohibited from doing so."

## DISCUSSION

■ The issue of assumption of risk involves the existence and scope of a defendant's duty of care, which is a legal question that depends on the nature of the activity involved and the parties' relationship to that activity. (*Knight v. Jewett, supra,* 3 Cal.4th at p. 313.) We review de novo the trial court's determination on the issue of assumption of risk, and all doubts as to the propriety of granting a motion for summary judgment must be resolved in favor of the party opposing the motion. (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131 [40 Cal.Rptr.2d 249]; see also *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 183 [203 Cal.Rptr. 626, 681 P.2d 893].)

■ The doctrine of assumption of risk in negligence cases embodies two components: (1) primary assumption of risk—where the defendant owes no duty to the plaintiff to protect him or her from the particular risk, and (2) secondary assumption of risk—where the defendant owes the plaintiff a duty, but the plaintiff knowingly encounters a risk created by the breach of that duty. (*Knight v. Jewett, supra,* 3 Cal.4th at p. 308.) Primary assumption of risk operates as a complete bar to the plaintiff's cause of action, while the doctrine of secondary assumption of risks is part of the comparative fault scheme, where the trier of fact considers the relative responsibility of the parties in apportioning the loss. (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 132.)

■ Before concluding that a case comes within the doctrine of primary assumption of risk, a court must not only examine the nature of the sport, but also the " 'defendant's role in, or relationship to, the sport.' " (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 133, quoting *Knight v. Jewett, supra,* 3 Cal.4th at p. 317.) Indeed, the scope of the legal duty owed by the defendant will frequently depend on such role or relationship. (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 317-318.) The *Knight* court noted that many courts, in analyzing the duty of the owner of a sports facility or ski resort, had defined "the risks inherent in the sport not only by virtue of the nature of the sport itself, but also by reference to *the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks*

*without altering the nature of the sport.*" (*Id.* at p. 317, italics added.) The court concluded "that in the sports setting, as elsewhere, the nature of the applicable duty or standard of care frequently varies with the role of the defendant whose conduct is at issue in a given case." (*Id.* at p. 318.)

Following *Knight*, we held in *Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at page 134, that despite the fact that being struck by an errant ball is an inherent risk in the sport of golf, the owner of a golf course owes a duty to golfers "to provide a reasonably safe golf course" which requires it " 'to minimize the risks without altering the nature of the sport. [Citations.]' " (*Ibid.*, quoting *Knight v. Jewett, supra,* 3 Cal.4th at p. 317.) We noted that if the defendant were the golfer who had hit the errant ball, the plaintiff's negligence action would be barred by the primary assumption of risk doctrine, but that the defendant owner of the golf course had an obligation to design a course that would minimize the risks that players would be hit by golf balls and affirmatively provide protection for players from being hit in the area of the course where the greatest danger existed. (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 134, citing *Knight v. Jewett, supra,* 3 Cal.4th at p. 317.) Therefore, we concluded the case was one involving secondary assumption of risk and that the trial court erred in granting summary judgment based on the doctrine of primary assumption of risk. (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at pp. 134-135.)

Similarly, here we hold a race organizer that stages a marathon has a duty to organize and conduct a reasonably safe event, which requires it to "minimize the risks without altering the nature of the sport." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 317; *Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 134.) This duty includes the obligation to minimize the risks of dehydration and hyponatremia by providing adequate water and electrolyte fluids along the 26-mile course—particularly where the race organizer represents to the participants that these will be available at specific locations throughout the race. (See *Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at p. 134; see also *Knight v. Jewett, supra,* 3 Cal.4th at p. 317.) Such steps are reasonable and do not alter the nature of the sport. Accordingly, we hold this is a case involving secondary assumption of risk, and therefore, the trial court erred in ruling Saffro's causes of action were barred by the doctrine of primary assumption of risk.

Moreover, we find that Saffro presented sufficient evidence to create an issue of fact as to whether Elite breached its duty to provide adequate water and fluids throughout the race. (*Morgan v. Fuji Country USA, Inc., supra,* 34 Cal.App.4th at pp. 134-135.) Magill, who finished the race within 30

minutes of Saffro, testified there was no water at the first station, only a trash can of water at the second station, and a jug of water at the third, and that Race Day was not available at *any* of the 23 stations. As Magill indicated in her deposition, when she was running the marathon, she did not know Race Day would not be available at any of the stations; rather, when she found she could not get Race Day at one station, she kept thinking it had to be available at the next. Moreover, Saffro suffered a grand mal seizure within hours of the race that his medical experts opined was the result of hyponatremia caused by his inability to consume adequate amounts of water and electrolyte fluids during the marathon. Elite also alluded to problems in providing adequate "race fundamentals" in a letter to participants following the race, and stated "[next year] you'll be able to drown at our water stations."

In addition, to the extent the trial court's statement, "there is no evidence that plaintiff attempted to obtain the sport drinks or water during the race at any of the water and refreshment stations," suggests a failure of proof on the issue of causation, we disagree. Saffro testified that his practice in running marathons is to stop at all the refreshment stands and drink the water and electrolyte fluids provided, and there is an issue of fact as to whether Elite made these liquids adequately available to him and other runners of similar ability and speed. Saffro's medical experts also declared his hyponatremia was caused by his inability to consume adequate amounts of water and electrolyte fluids during the marathon. Moreover, it strains reason to conclude that Saffro or any runner in a major marathon would not stop or attempt to stop, at all, for water and fluids that are represented to be available throughout the course. Thus, the circumstantial evidence presented creates an issue of fact regarding causation, even though Saffro is unable to remember the details in running the race. (See *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1027-1028 [37 Cal.Rptr.2d 431].)

Further, given Saffro's resulting neurological injuries which have impaired his memory, and the evidence of inadequate provision of water and electrolyte fluids, this may be a case in which the burden of proof regarding causation would be shifted to Elite as a matter of public policy. (See *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 762 [91 Cal.Rptr. 745, 478 P.2d 465].) In *Haft*, the decedents were found dead in the bottom of a hotel pool; no one had witnessed them drown, but the hotel owners had failed to comply with several safety regulations regarding pools. (*Id.* at pp. 762-763.) The court held that where there is a substantial probability that the defendant's negligence was a cause of the injury and when such negligence makes it impossible as a practical matter for the plaintiff to prove proximate causation conclusively, it is appropriate to shift the burden to the defendant

to prove its negligence was not a cause of the injury, i.e., in those circumstances, the burden was more appropriately borne by the party with greater access to information. (*Id.* at p. 774, fn. 19.) ▮▮ We do not hold that the burden should be shifted in this case, only that the circumstances of this case raise this issue, and we leave this matter for the trial court to address, depending on what, if any, additional evidence is adduced.

Accordingly, because Saffro's causes of action are not barred by the doctrine of primary assumption of risk, and there are issues of fact on the issues of negligence and causation, the trial court erred in entering summary judgment against him.

### DISPOSITION

The judgment is reversed. Costs are awarded to Saffro.

O'Rourke, J., and McConnell, J., concurred.

A petition for a rehearing was denied May 31, 2002, and respondent's petition for review by the Supreme Court was denied July 31, 2002. Brown, J., did not participate therein.