Filed 3/29/22  Williams v. CrossFit Anywhere Folsom CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ERIC WILLIAMS, | C087568 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2015-00187668-CU-PO-GDS) |
| v. | |
| CROSSFIT ANYWHERE FOLSOM, LLC, | |
| Defendant and Respondent. | |

Plaintiff Eric Williams was injured when a cyclist collided with him during an early morning group exercise run.  Williams sued defendant CrossFit Anywhere (CFA), the fitness club that had organized the run.  Following the trial court's grant of summary judgment to CFA, Williams appeals contending (1) a liability release he signed was unenforceable because it was subtitled, "insurance jargon"; (2) CFA's failure to satisfy minimum safety standards constituted gross negligence; (3) being struck by a cyclist is

1

not an inherent risk of participating in a group fitness class; and (4) triable issues of fact exist as to whether CFA could have minimized the risk without fundamentally altering the nature of the activity.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Williams sued CFA for negligence. Williams alleged he was a paid participant in a fitness class organized by CFA. During the class, he was instructed by CFA employees to go for a run, which included running on a trail adjacent to Folsom Lake Crossing road. During the run, Williams was hit from behind by a cyclist traveling at high speed and suffered "grave injuries."

Williams alleged, inter alia, that CFA had negligently or recklessly failed to supervise the run, and failed to provide lighting for participants, which significantly increased the risk of harm and was a substantial cause of the collision.

### CFA's Motion for Summary Judgment

CFA moved for summary judgment, averring Williams had signed a liability waiver assuming the risk of injury. The release, according to CFA, was easily readable, placed in a manner to compel notice, and was broad enough to cover the injury, as CFA had not acted in a grossly negligent manner.

CFA attached the signed release to the motion. One page was titled, "AGREEMENT AND RELEASE OF LIABILITY." Under that was a subtitle in parentheses, "(more insurance jargon)." Below that were three numbered paragraphs, each initialed by Williams. One paragraph provided in part: ". . . I do hereby waive, release and forever discharge CrossFit Anywhere . . . from any and all responsibilities or liability for injuries or damages resulting from any participation in any activities . . . ." Another paragraph provided in part: "I also understand that fitness activities involve a risk of injury and even death and that I am voluntarily participating in these activities . . .

2

with knowledge of the dangers involved. I hereby agree to expressly assume and accept any and all risks of injury or death." Another page of the membership agreement was titled, "INFORMED CONSENT AGREEMENT" and included the subtitle, "(insurance jargon)." It too was signed by Williams and referenced the general assumption of numerous risks.

CFA also argued that running on the trail involved the inherent risk of collision with bicycles. Williams had run the trail before, knew it was shared by joggers and cyclists, and had not complained that it was unsafe. In an attached deposition transcript, Williams testified that he had "zero" recollection of the day of the accident, and his last recollection before that January 2015 accident was a "a vague . . . recollection of Thanksgiving . . . 2014." He also testified that he had run the hill run between three and seven times before. The trail had a sign telling cyclists to keep right and pedestrians to keep left. Williams also testified that when he signed up for CFA, he expected that he would be doing exercises that included "[c]ircuit training, running, and lifting."

Williams testified that he felt the trail was unsafe. He explained that sometimes while working with patients on the trail (he had been a paramedic), "a bicyclist zooms by us, and it's just a major threat and problem." When asked, "Were you ever provided any kind of headlamp or light by [CFA]?" he testified, "Never."

Defendant's motion also argued that instructing a fitness class to run on a paved trail is not "totally outside the range" of how a fitness class should be conducted. Furthermore, CFA had told its members to be safe, to use the left-hand side of the trail, and had made lights available for running outside. In an attached deposition transcript, a CFA member, who was present during the accident, testified that coaches had told them to stay on the left-hand side, and "we had been told numerous times to bring lights and lights are available." She also testified, "[t]he lights are always made available, but [the coaches] did not tell us that we had to take one," nor were members told to wear reflective clothing.

3

As to the incident, the member testified the run was a 1.8-mile, mostly inclined, timed run, on a pedestrian path near the dam and the Johnny Cash Bridge, followed by a jog back. She also testified that she knew she was going to go for a run because she had checked the CFA website the night before.

According to the CFA member, certain places on the trail are not lit, and on the day of the incident, it was "very, very dark." They did not see bikes on the trail when running up the hill. On her way back, she jogged with Williams. Three others were jogging in front of them. Mid-conversation, while jogging side-by-side with Williams, she heard the sound of impact and saw Williams being thrown. Before the accident, she heard no noises and saw no lights behind her. They were on the left-hand side of the trail, and Williams was on her right-hand side.

The motion also attached the deposition of the cyclist who hit Williams. He testified that he was going about 25 to 30 miles per hour during the accident. He testified he was riding on the right side of the bike lane and saw reflections from Williams's shoes a split second before colliding with him. The cyclist testified that he understood that walking or jogging pedestrians were to run against traffic, and bikes would travel on the right side of the yellow line.

The posted speed limit for bicycles was 15 miles per hour.

Williams's Opposition to CFA's Motion for Summary Judgment

Williams opposed the motion, arguing there was a triable issue of material fact as to whether the release provided a complete defense. He pointed to the subtitle, "more insurance jargon," arguing it stood in contrast to other language in the agreement which cautioned readers to "Please Read Carefully," and thus rendered the release as a whole inconspicuous, and therefore ineffective and void.

Williams went on to argue that even if he had waived negligent conduct, there was a triable issue of fact as to gross negligence. He averred that sending a class to run in the

4

dark, without notifying members that parts of the route would lack artificial light and without instructing them to wear attire to make them visible, was an extreme departure from the ordinary standard of care.

In support, he included two expert declarations with attached documents. One—a declaration of Matthew Forsman, a full-time professional running coach since 2005, who leads a running club and numerous group runs—averred that a 3.6-mile run is a "group run" as used in the industry, and industry standards apply to coaches and trainers who plan and direct group runs. One such standard is that at least one trainer or coach accompanies the group run and ensures the visibility of the group. He wrote: "It would be shocking if a coach planned and directed a group run, but then did not run with the group and began training another class without taking any steps to make sure all runners finished and made it back safely."

Another standard, according to the expert's declaration, is to avoid, when possible, sending people out on group runs in areas that do not have adequate lighting. He declared: "The industry standards require group run leaders to take steps to ensure their runners can see and be seen during every run." He also declared: "It would be very disconcerting, and would constitute a radical departure from the norm, if a fitness club directed its class members to participate in a run in the dark, on a shared-use trail without street lights, without any coach or trainer accompanying the runners, without anyone running sweep, without providing advance notice and instruction to bring reflective apparel and lights, without warning members that the entire run would take place in the dark and would pass through areas that were unlit, without instructing and reminding members to put on lights and reflective vests, and without ensuring that the group as a whole was equipped with adequate reflection and lights to ensure the group was visible." He called such a scenario "shocking to the vast majority of running coaches," and a failure to show "even the slightest regard for their obligation" to provide for the safety of the group.

Forsman cited and attached a document, "Guidelines for Leading a Group Run" by the "Road Runners Club of America." One guideline therein stated: "Avoid running on trails in the evening if they are not well lit and do not have regular traffic."

The other declaration was from David Gilbertson, a gym and fitness studio owner, and gym and fitness consultant. He wrote: "a fitness center must ensure that there is adequate lighting for the members to see and be seen," and, "[i]t is an extreme departure from the industry standard of conduct for a fitness center and personal trainer to design an outdoor workout, and send members out to engage in an outdoor run, without making sure that those members will be able to see and be seen."

Gilbertson cited an attached document, "Safety in Training," which included the bullet point: "Is there adequate lighting (sun, field lights, street lights)? If not, are proper reflective or illuminated tools or clothing available?"

Gilbertson also wrote that CFA's failure to consider the safety of its workout and whether its members could be seen, "was an extreme departure from the industry standard of conduct." He continued: "simply making [lights] available without instructing the class members that a particular workout would take place in a dark and dangerous area, which mandated that they bring a light, is woefully insufficient to meet the basic industry standard and to keep [CFA] members safe. Tellingly, Mr. Williams did not seem to be aware that lights were even available to him." He also wrote: "Mr. Williams did not sign up for a running club. He signed out for directed group workouts as part of the [CFA] fitness program. This program includes weight-lifting and whole body fitness. There is nothing inherent in these activities that requires members to run in the dark, let alone to run in the dark without any lighting or safety precautions."

Williams also averred in his response to the motion that primary assumption of the risk did not apply because CFA unreasonably increased the risks beyond those inherent in fitness training or group running. Williams argued that the CFA fitness class did not "aim to challenge athletes to dodge bikes and cars, or to improve their night vision." And

6

"[t]here is nothing inherent in a fitness class, or even in running, that requires an instructor to send a class running in the dark, on a bike path, with no illumination, protections, or warnings."

CFA's Reply

In its reply, CFA averred that Williams's opposition was largely based on the two declarations. And Williams had not disputed the undisputed material facts with actual evidence. CFA also moved to strike the expert declarations of Forsman and Gilbertson.

The Trial Court's Order

The trial court granted CFA's summary judgment motion and entered judgment accordingly. In a written ruling, it sustained CFA's objection to Williams's two expert declarations. The court noted that it need not consider expert testimony that constitutes a conclusion of law. And while a court may receive testimony on the question of legal duty for an "esoteric activity," the court found nothing esoteric about the activity in which Williams was engaged, and thus no expert testimony was necessary to determine if the inherent risks were increased by CFA's conduct.

The court went on to conclude that CFA had carried its burden of production, while Williams had failed to carry his burden of producing admissible evidence establishing a triable issue of material fact. It found none of Williams's proffered issues of disputed fact were truly material or borne out by the evidence.

As to the "insurance jargon" subtitle in the liability release, the court found no triable issue of material fact, noting "the very evidence cited by the opposition confirms that this provision was presented in such a way to ensure plaintiff's attention and in plain language explains that he was releasing defendant [CFA] from liability for any injury or damages suffered while participating in [CFA's] activities even if caused by a negligent act or omission."

7

The court concluded that the undisputed evidence showed that plaintiff had voluntarily signed a release covering CFA activities, including injuries caused by negligence. And Williams had failed to offer evidence of gross negligence to overcome the release. Williams also failed to offer evidence demonstrating a triable issue of material fact relating to primary assumption of risk.

DISCUSSION

I

*The Release of Liability*

Williams first challenges the grant of summary judgment, contending the liability release he signed was not enforceable. He argues that by labeling the release, "insurance jargon," CFA effectively told members it was unimportant, unreadable, or need not be read, and therefore negated other features in the agreement that allowed the release to stand out. In support, he cites *Leon v. Family Fitness Center (#107), Inc.* (1998) 61 Cal.App.4th 1227, 1232, which explains, "a release must not be buried in a lengthy document, hidden among other verbiage, or so encumbered with other provisions as to be difficult to find." We hold the release is enforceable.

The crux of this issue is whether an apparently jocular subtitle can render an otherwise unobjectionable, clearly stated liability release unenforceable. In the matter before us, we conclude it does not. Williams offers no authority to support his contention that a subtitle can undermine an otherwise proper release, and we are not aware of any. Case law does, however, instruct on what an exculpatory agreement must do to be effective.

A release " ' " 'must be clear, unambiguous, and explicit in expressing the intent of the subscribing parties,' " ' " though it " ' "need not achieve perfection." ' " (*Eriksson v. Nunnink* (2015) 233 Cal.App.4th 708, 722.) A release may run afoul of this requirement if the critical statement is "buried in the midst of a highly prolix sentence,

8

which was itself surrounded by paragraphs of fine print." (*Bennett v. United States Cycling Federation* (1987) 193 Cal.App.3d 1485, 1489.)

Did the subtitles "(insurance jargon)" and "(more insurance jargon)" effectively bury the critical statements? They did not. This is particularly so given that the subtitles were placed under the more prominent titles, "AGREEMENT AND RELEASE OF LIABILITY" and "INFORMED CONSENT AGREEMENT," and that the critical paragraphs had to be initialed, and the bottom of the page signed. On this record, we conclude a reader would see the subtitles for what they were: an attempt at wry, self-aware humor, and nothing more.

The release was therefore enforceable.

## II

### *Gross Negligence*

Williams next contends that if the release is valid, CFA can still be held liable because its failure to satisfy minimum safety standards in planning and executing the group run constituted gross negligence. In conjunction with this claim, Williams contends the trial court erred in excluding his proffered expert declarations and attachments. He argues such evidence is routinely relied upon to prove the existence of an industry standard in connection with a gross negligence claim. And when those declarations and accompanying documents are properly considered, a triable issue of fact exists as to whether CFA's conduct constituted an extreme departure from the ordinary standard of care. He specifically points to the failure to instruct or remind runners to wear reflective clothing and lights, to provide reflective gear to those without it, and to select safe routes with adequate lighting.

At the outset, we find no error in the exclusion of Williams's expert declarations and accompanying exhibits. This court considered a similar contention in *Towns v. Davidson* (2007) 147 Cal.App.4th 461, 465, where a skier was injured when a skiing

9

employee of the ski resort collided with her. The trial court granted the defendants summary judgment based on assumption of risk, and we affirmed that judgment on appeal. (*Id*. at pp. 466, 474.) The plaintiff there argued she had shown a disputed issue of fact supported by an expert's declaration, which the trial court had refused to consider. (*Id*. at pp. 470-472.) We concluded that striking the declaration was within the trial court's discretion, explaining that while such evidence can be used to oppose a summary judgment motion, in the context of assumption of the risk the role of such experts is more limited. (*Id*. at p. 472.) It is the court's role to determine if the activity is an active sport, its inherent risks, and whether those risks have been increased. (*Ibid*.) While a court may inform its decision using expert factual opinion—particularly for unknown or esoteric activity—the court may not receive expert evidence on the ultimate legal issues of inherent risk and duty. (*Id*. at pp. 472-473.) And because the nature and risks of downhill skiing are well understood, the demarcation of duty owed is judicially defined, and the facts in the case were undisputed, there was little an expert opinion could add. (*Id*. at p. 473.) We also noted the proffered expert opinion " 'was advocating, not testifying.' " (*Ibid*.)

The same is true here. Running is not the sort of activity where expert factual opinion is needed. The inherent risks of running are understood. And being hit by a cyclist while running is not the sort of complex injury where an expert's explanation is helpful in determining if a duty has been breached. (Cf. *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173, 176 (*Saffro*) [expert declarations explained that the runner's injury, hyponatremia, is caused by the inability to consume adequate amounts of water and fluids containing electrolytes].)

And indeed, here, the proffered declarations offered little more than advocacy: "It would be shocking if a coach planned and directed a group run, but then did not run with the group . . ."; and "There is nothing inherent in these activities that requires members to run in the dark, let alone to run in the dark without any lighting or safety precautions."

10

There was, therefore, no abuse of discretion in striking the expert declarations. (See also *Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344, 356 (*Willhide-Michiulis*) [Citing *Towns v. Davidson*, and concluding plaintiffs' experts provided only ultimate conclusions of law, and "shed no light on the subject except to say [the defendant's] conduct was 'an extreme departure from an ordinary standard of conduct' "]; *American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 39 ["It will always be possible for a plaintiff who suffers a sports injury to obtain expert testimony that the injury would not have occurred if the recreation provider had done something differently. . . . Such expert opinion does not create a triable issue of fact" as to assumption of the risk].) Williams maintains that courts are split on the standard of review for such evidentiary rulings. This court applied the abuse of discretion standard in *Towns v. Davidson, supra*, 147 Cal.App.4th at page 472 and *Willhide-Michiulis* at page 356. But even under a de novo standard, we would find the evidence properly excluded.

We further conclude, on the evidence properly admitted, there was no dispute of fact as to whether CFA engaged in gross negligence. Gross negligence has been defined as a " ' " 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct.' " ' " (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.)

Here, Williams offers no admissible evidence of such a departure. He does, however, cite *Rosencrans v. Dover Images, Ltd*. (2011) 192 Cal.App.4th 1072 (*Rosencrans*) and *Jimenez v. 24 Hour Fitness USA, Inc*. (2015) 237 Cal.App.4th 546 (*Jimenez*), arguing they represent analogous departures from clear industry standards.

In *Rosencrans*, the plaintiff motocross rider was injured when he fell on the downslope of a ramp, outside of view of other riders, and was hit by another rider. (*Rosencrans, supra*, 192 Cal.App.4th at p. 1077.) The plaintiff complained that the defendant track operator should have stationed a flagger at the location of the injury to alert other riders of a fallen rider on the track. (*Id*. at p. 1078.) The trial court granted the

11

operator summary judgment, and the appellate court reversed, concluding that whether the operator's conduct constituted gross negligence was a triable issue of fact. (*Id*. at pp. 1079, 1086-1087.) The court cited evidence of an instruction manual for safety flaggers and the declaration of a motocross safety expert, in concluding there was an industry standard practice to have a flagger on the platforms at all times. (*Id*. at pp. 1079, 1086-1088.)

In *Jimenez, supra*, 237 Cal.App.4th 546, 549, the plaintiff was injured at a gym when she fell from a moving treadmill and hit her head on an exercise machine, positioned three feet 10 inches away. Evidence was presented that the treadmill owner's manual stressed the importance of providing a minimum six-foot safety clearance behind the treadmill. (*Id*. at pp. 550-551.) The trial court, nevertheless, granted the gym summary judgment, concluding in part that a space of three to four feet, rather than the recommended six-foot difference cannot constitute gross negligence. (*Id*. at p. 553.) The appellate court reversed, explaining that a jury could find that it is an industry standard practice to provide a minimum six-foot safety zone around the treadmill based on the owner's manual and expert declaration, and that the departure from that standard was an extreme departure from the ordinary standard of conduct. (*Id*. at pp. 557, 562.)

Williams argues that like in *Rosencrans* and *Jimenez*, he produced evidence that CFA's conduct was an extreme departure from clear industry standards, raising a triable issue of gross negligence.

We do not find this argument persuasive. *Rosencrans* and *Jimenez* illustrate the type of evidence helpful to establish an industry standard, as well as the type of esoteric activity where such evidence is helpful. But, again, running on a public trail in dim light is anything but esoteric, and the proffered expert evidence amounted to no more than advocacy. And beyond that evidence, Williams points to nothing showing that organizing an early morning run, with lights made available, ran afoul of an established industry standard.

In his reply brief, Williams challenges the assertion that lights were provided, averring without citation: "One member says the items were available, but another member says they were not." He was apparently referring to himself, as he later cites his own deposition, wherein he answered "Never," when asked, "Were you ever provided any kind of headlamp or light by [CFA]?" But Williams also testified to having "Zero" recollection of the day of the accident, and that his last recollection before the accident was "a vague . . . recollection of Thanksgiving . . . 2014." (Evid. Code, § 702 ["the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter"].)

We therefore conclude Williams has failed to show a triable issue of fact as to gross negligence.

### III

### *Inherent Risk*

Next, Williams contends that being struck by a cyclist is not an inherent risk of participating in a group fitness class, and therefore triable issues of fact exist as to whether the doctrine of primary assumption of the risk bars his claim. He reasons that the evidence shows he had no plans to participate in a trail run that morning, and no reason to suspect he might be going for a long run when he arrived at CFA. In support, he points to *Solis v. Kirkwood Resort Co*. (2001) 94 Cal.App.4th 354, 358 (*Solis*), as analogous.

In *Solis*, a skier at the defendant ski resort was injured when he inadvertently entered an area recently altered for a ski race, which included hazardous man-made jumps. (*Solis, supra*, 94 Cal.App.4th at p. 358.) The trial court found the suit barred by assumption of the risk, and we reversed. (*Id*. at pp. 359, 367.) We noted that falling is an inherent risk of skiing, which the resort has no duty to eliminate or mitigate. (*Id*. at p. 364.) But there was evidence the resort, by creating the racing area, increased the risk

13

of skiing beyond that inherent in the sport. (*Id*. at p. 365.) And by failing to mark off the race area, an ordinary skier would not expect to encounter the jumps. (*Ibid*.) We held that when a resort turns a previously ordinary ski run into a dangerous racing area, it owes a duty to warn patrons. (*Id*. at p. 366.)

Williams argues that here too, a jury could conclude that he simply wanted to participate in an indoor group fitness class. But due to CFA's conduct, Williams found himself participating in the sport of trail running instead, and "being struck by a cyclist is *not* an inherent risk of participating in a group fitness class—especially one that typically takes place indoors and consists primarily of strength training, as opposed to cardiovascular, exercises."

The evidence is that Williams enrolled in a *cross* fitness program and expected to do exercises that included running. That Williams may or may not have checked the morning's activity on the CFA webpage the night before (Williams testified to "zero" memory of the day of the accident) is of no moment.

Nor is *Solis* of any help. The critical feature of *Solis* is that the plaintiff was engaged in one activity, with certain accompanying assumed risk, when without warning he was made to engage in a different activity with greater risk—risks he had not assumed. That was not the case here; the contention therefore fails.

IV

*Duty to Minimize Risks*

Finally, Williams argues that even if being struck by a cyclist is an inherent risk of the activity in which he was participating, summary judgment was still improper because disputed issues of fact exist as to whether CFA could have minimized that risk without fundamentally altering the nature of the activity. In support he cites *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127 (*Morgan*), and *Saffro, supra*,

14

98 Cal.App.4th 173, wherein a disputed issue was found as to whether the defendant could have minimized the inherent risks without altering the nature of the activity.

In *Morgan, supra*, 34 Cal.App.4th at page 130, a golfer was injured by an errant golf ball. Prior to the injury, a tree had provided some protection from errant balls in the location of the injury. But the tree had been removed, and afterwards the plaintiff had seen several balls nearly strike golfers. (*Ibid.*) The trial court granted the golf course summary judgment based on assumption of the risk. (*Ibid.*) The appellate court reversed, explaining that while errant balls are an inherent risk in golf, the course owner and operator owes a duty to provide a reasonably safe golf course, and accordingly, " 'to minimize the risks without altering the nature of the sport.' " (*Id*. at pp. 134-135.) The owner therefore must design a course to minimize the risk of getting hit by balls. (*Id*. at p. 134.) And to that, evidence showed the area where the injury occurred was particularly dangerous due to the course design, which could support a finding of a breach of duty. (*Id*. at pp. 134-135.)

Similarly, in *Saffro, supra*, 98 Cal.App.4th at page 176, a runner suffered hyponatremia from the inability to consume adequate fluids with electrolytes during a marathon. Before the run, the defendant race organizer had sent materials to runners stating that there would be 23 refreshment stations with electrolyte fluid throughout the course. (*Ibid.*) This, however, was not done. (*Id*. at p. 177.) The runner sued, but the trial court granted summary judgment to the organizer based on assumption of the risk. (*Id*. at pp. 177-178.) The appellate court reversed, finding triable issues of fact as to negligence and causation. (*Id*. at p. 181.) Doing so, it held a race organizer owes a duty to conduct a reasonably safe event and to minimize the risk without altering the sport's nature, which includes the duty to provide adequate water and electrolyte fluids along the 26-mile course. (*Id*. at p. 179.)

Here, Williams argues that like in *Morgan* and *Saffro*, CFA could have minimized the risk without altering the activity's nature by selecting a route with adequate lighting

along the entire path or instructing members on the need to protect themselves using lighting and reflective apparel.

We find *Morgan* and *Saffro* factually distinguishable. In *Morgan*, the defendant removed a tree that had previously provided protection from errant balls (a danger made possible by the course design). Here, no safety feature had been removed by CFA, and CFA merely made use of a public trail—it had no role in its design.

In *Saffro* the breach of duty revolved around the failure to provide electrolytes— exacerbated by the promise that it would. Here, there was no such failure. Indeed, CFA did provide lights. And we do not think that *Saffro* can be read so far as to conclude that even if the organizer had provided electrolytes in water, it could be held liable if a runner was injured after failing to drink the water.

More fundamentally, arguments similar to Williams's have been raised before. (See, e.g., *Willhide-Michiulis, supra*, 25 Cal.App.5th at p. 361 [argument that snowcats operating on ski runs are neither necessary nor inherent to the sport].) Implicit in such arguments is that primary assumption of the risk does not apply to an obvious risk if a defendant could have feasibly provided safer conditions. (See *Ibid.* citing *Souza v. Squaw Valley Ski Corp.* (2006) 138 Cal.App.4th 262, 269 (*Souza*).) Courts considering such arguments, including this one, have agreed that such a conclusion " ' " 'would effectively emasculate the doctrine, . . . changing the critical inquiry . . . to whether the defendant had a feasible means to remedy [the dangers].' " ' " (*Willhide-Michiulis*, at p. 361; *Souza*, at p. 269; *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 13 citing *Verro v. New York Racing Assn, Inc*. (1989) 142 A.D.2d 396, 400.)

And here too, with the benefit of hindsight, avoiding *this* injury may have been feasible—but that is not the test. Indeed, forgoing the use of the public trail that day would have avoided the speeding cyclist. As we have found *Morgan* and *Saffro* distinguishable, we accordingly conclude Williams has failed to show a disputed issue of

16

fact as to whether CFA could have minimized that risk further than it did or attempted to do without fundamentally altering the nature of the activity.

## DISPOSITION

The judgment is affirmed. Williams will pay CFA's costs on appeal. (Cal. Rules of Court, rule 8.278.)

                                                 _____

                                                 HULL, J.

We concur:

_____

RAYE, P. J.

_____

ROBIE, J.